11 CIV 4511

JUDGE McMAHON

Robert L. Levy (RL-1633)
BANTLE & LEVY LLP
817 Broadway
New York, New York 10003
(212) 228-9666
Attorneys for Plaintiff

RECEIVED JUN 30 2011 U.S.D.C. S.D. N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KERRY ANNE REGAN,

Plaintiff,

-against-

THE BENCHMARK COMPANY LLC, TRINET GROUP, INC., ADAM GORDON, and RICHARD MESSINA

Defendants.

---

CIV

**COMPLAINT**

PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff, Kerry Anne Regan, by her attorneys, Bantle & Levy LLP, alleges for her complaint against defendants, The Benchmark Company LLC, TriNet Group, LLC, Adam Gordon and Richard Messina as follows:

## NATURE OF THE ACTION

1. The plaintiff herein, Kerry Anne Regan, spent years building a career and book of business as a stock trader while employed by Benchmark Company LLC, only to have her accounts and client relationships systematically and deliberately destroyed by Benchmark and its owners in retaliation for her raising concerns – to Benchmark's senior management and its designated HR representative – about rampant sexism, sexual harassment and unequal treatment in the workplace. When threats, harassment, and refusal to investigate did not dissuade Regan from her insistence on fair and equal treatment, the defendants intensified their campaign against

Regan by physically banishing her from the company's New York trading floor to a newly created "New Jersey office" consisting of only Regan. There, the defendants were able to isolate Regan from all necessary institutional support and even deliberately block or muddle her attempts to make trades. These conditions created obvious tension between Regan and her steadily dwindling roster of clients and ultimately destroyed her health, well-being, and the career she had worked so hard to build.

2. Plaintiff brings this action for employment discrimination based on sex and retaliation for opposing workplace discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") and New York City Administrative Code §8-101 et seq., (the "Administrative Code"). Said violations arose from, inter alia, defendants' creation of a hostile work environment based on sex and in retaliation for plaintiff's stated opposition to discrimination in the workplace, repeated adverse employment actions denying plaintiff the same professional and financial opportunities as her male contemporaries, and, ultimately, defendants' constructive discharge of plaintiff. Plaintiff seeks monetary and declaratory relief on these claims.

## JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f)(3). This Court has supplemental jurisdiction over plaintiff's city law causes of action pursuant to 28 U.S.C. §1367(a).

4. Venue is properly laid in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to plaintiff's claims occurred in this District and one or more of the defendants may be found in this District.

5. All conditions precedent to jurisdiction have occurred or been complied with:

a. Plaintiff filed a Charge of employment discrimination on the basis of sex and retaliation with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse actions of which plaintiff complains in this action.

b. After a lengthy and extensive investigation into plaintiff's claims, the EEOC issued a Determination, dated July 8, 2010, in which it found that, "based on the totality of the evidence . . . there is reasonable cause to believe" plaintiff's Title VII rights had been violated by Benchmark and Gevity. Specifically, the EEOC concluded that, "Charging Party and a class of other female employees were victims of a sexually hostile work workplace", that "Respondent's actions toward Charging Party, including Charging Party's involuntary transfer to a non-Respondent facility in New Jersey, were in retaliation for charging Party's protected activity", and that "Charging Party was constructively discharged because [workplace] conditions were so intolerable that a reasonable person under the circumstances would have felt compelled to resign." The EEOC also expressly concluded that Benchmark and Gevity were "both employers under Title VII."

c. After unsuccessful efforts to conciliate this matter, the EEOC issued a Notice of Right to Sue, dated March 31, 2011, in connection with plaintiff's charges.

d. This Complaint has been filed within 90 days of plaintiff's receipt of the EEOC's Notice of Right to Sue.

6. Plaintiff has mailed a copy of this complaint to the Corporation Counsel for the City of New York and to the New York City Commission on Human Rights as required under New York City Administrative Code §8-502.

**PARTIES**

7. Plaintiff Kerry Anne Regan ("Regan") is a female citizen of the United States

who at all times relevant herein resided in New York City and/or New Jersey.

8. Regan was employed by defendants, The Benchmark Company LLC, and/or its predecessor in interest, Benchmark-Pellinore Group, Inc. (collectively, "Benchmark" or the "Company"), and TriNet Group, Inc. ("TriNet"), and/or its predecessor in interest, Gevity HR, Inc. ("Gevity"), as co-employers, from in or about March 2003 until the constructive termination of her employment..

9. Until the retaliatory banishment of Plaintiff to office space in New Jersey previously unused by Benchmark, Plaintiff was employed by Benchmark at its principal place of business and headquarters in New York City.

10. On information and belief, defendant Benchmark is a for-profit limited liability company organized and existing under the laws of the State of New York, with its principal place of business at 40 Fulton Street, New York, New York 10038. Benchmark is a broker dealer serving institutional and private investment clients.

11. At all times relevant herein, Benchmark is and was a person within the meaning of §701(a) of Title VII. Benchmark also is a person within the meaning of §8-102(1) of the Administrative Code.

12. At all times relevant hereto, Benchmark is and was an employer engaged in industry affecting commerce and has employed more than fifteen (15) employees within the meaning of Title VII. Benchmark also is an employer within the meaning of § 8-102(5) of the Administrative Code.

13. On information and belief, defendant TriNet is a for-profit limited liability company organized and existing under the laws of the State of California, with its principal place of business at 1100 San Leandro Boulevard, Suite 300, San Leandro, California 94577.

14. Defendant TriNet is a professional employer organization ("PEO") that provides an array of administrative benefits and services to companies throughout the United States.

15. By operation of law, TriNet is the successor in interest of Gevity, which it acquired in or about 2009.

16. Upon information and belief, prior to its acquisition by TriNet, Gevity was a for-profit limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 9000 Town Center Parkway, Bradenton, Florida 34202.

17. At all relevant times herein, Gevity was a professional employer organization ("PEO") providing an array of administrative benefits and services to its client-companies.

18. At all relevant times herein, Gevity maintained an office at 122 East 42nd Street, New York, New York, through which it, inter alia, provided human resources services to Benchmark.

19. At all relevant times herein, TriNet is and Gevity was a person within the meaning of §701(a) of Title VII and §8-102(1) of the Administrative Code.

20. At all times relevant hereto, TriNet is and Gevity was an employer engaged in industry affecting commerce and has employed more than fifteen (15) employees within the meaning of Title VII. In addition, TriNet is and Gevity was an employer within the meaning of §8-102(1) of the Administrative Code.

21. Upon information and belief, Benchmark and Gevity entered into an agreement for Gevity to provide Benchmark with comprehensive human resources services, including handling complaints of discrimination and harassment on behalf of Benchmark.

22. Upon information and belief, pursuant to the agreement, Benchmark and Gevity were, at all relevant times herein, jointly responsible for Benchmark's compliance with, inter

alia, Title VII and the Administrative Code, and as such were the dual employer of Regan for such purposes.

23. Upon information and belief, defendant Adam Gordon ("Gordon") is a male citizen of the United States and a resident of the State of New York. Upon information and belief, at all relevant times hereto, Gordon has been co-Chief Executive Officer of Benchmark.

24. Upon information and belief, defendant Richard Messina ("Messina") is a male citizen of the United States and a resident of the State of New York. Upon information and belief, at all relevant times hereto, Messina has been co-Chief Executive Officer of Benchmark.

25. At all times relevant hereto, Gordon and Messina shared primary responsibility for running Benchmark and each had authority to act on behalf of Benchmark in the hiring and firing of employees and establishing the terms and conditions of employment at Benchmark.

## STATEMENT OF FACTS

### Regan Commences Employment with Defendants

26. Regan commenced employment with Benchmark on March 3, 2003 as a Vice President of Sales Trading in its NYC office.

27. As a Vice President of Sales Trading, Regan was primarily responsible for facilitating trading in domestic stocks on national exchanges for existing clients of Benchmark and customers she developed during her employment.

28. Throughout Regan's employment at Benchmark, Gordon and Messina had primary responsibility for running Benchmark's New York City office, including overseeing Regan's day-to-day work and setting Regan's compensation.

29. Throughout her employment with Benchmark, Regan's compensation was entirely commission-based, with Regan to receive commissions of up to thirty-five percent

(35%) of the trading revenue generated by business which she brought into the Company.

30. Throughout Regan's employment at Benchmark, Gevity was charged with providing Benchmark with comprehensive human resources services.

31. At or about the commencement of Regan's employment with Benchmark, Gevity advised Regan in writing that based on its contractual responsibility to provide comprehensive human resources services, Regan was a "co-employee" of Benchmark and Gevity, and as such required Regan to complete an IRS Form W-4 on its behalf.

32. At or about the commencement of Regan's employment with Benchmark, Gevity also advised Regan in writing that as her co-employer, it would be providing her relevant "HR services", including expressly stating that the Company, along with Benchmark, should be notified "if you believe you are subjected to … any type of harassment, including sexual harassment …."

33. Written materials provided to Regan by Gevity at or about the commencement of Regan's employment with Benchmark contained a so-called "Anti-Harassment and Mutual Respect Policy" detailing that sexual harassment will not be tolerated by Benchmark and/or Gevity.

34. Gevity's "Anti-Harassment and Mutual Respect Policy" further stated that an employee should report violations of the policy to management and/or to Gevity, and that "[a] thorough investigation will be conducted" and that "there will be no retaliation …."

35. Gevity's policy also expressly states that neither Gevity nor Benchmark would, "tolerate any actual or attempted reprisals or retaliation against an employee who raises a sincere and valid concern that this policy has been violated."

Regan Is Subjected To Differential Treatment at Benchmark Based on Her Sex

36. From virtually the commencement of her employment at Benchmark, Regan was subjected to differential treatment in the terms and conditions of her employment based on her sex.

37. Benchmark provided Regan's male counterparts with access to the Company's most advanced trading systems and tools, permitted them to distribute firm research on a virtually unlimited basis, and gave them extensive senior management support.

38. Regan was denied these advantages.

39. Unlike male sales traders, Regan frequently was forced to share accounts she generated with other sales traders at Benchmark.

40. Thus, while Regan opened over twenty institutional accounts while employed at Benchmark, many of them managing over a billion dollars in assets, her compensation did not fully reflect the business she developed.

41. Accounts that Regan opened while employed at Benchmark, but was forced to pass along to or share with male sales traders, included, inter alia, Morgan Stanley Investment Management, Perry Capital, Coatue Partners, Cydonia Capital and Suffolk Capital.

42. In addition, males sales traders regularly were permitted to "poach" Regan's accounts, a practice otherwise prohibited at Benchmark.

Severe and Pervasive Sexist Conduct and
Comments Permeated Benchmark's Work Environment

43. From virtually the inception of her employment, it became apparent to Regan that the workplace environment at Benchmark was rife with sexist conduct and that male traders regularly made negative, sexually graphic and objectifying comments about women.

44. Such comments were made throughout each work day and frequently were also made by members of the Company's senior management.

45. Male employees at Benchmark regularly used binoculars to look in on college women living in a college dormitory across the street from Benchmark's office.

46. While observing these female college students, Benchmark employees regularly offered a running commentary about how the women looked and what they were doing. Much of these comments were of a sexual nature, including statements about sexual acts the male employees would like to perform on certain of these women.

47. Gordon and Messina frequently participated in this conduct using their own binoculars.

48. Gordon often joked about this conduct, including remarking on one occasion that "instead of calling the company Benchmark Capital, we should have been called Voyeur Capital".

49. Similarly, male stock traders at Benchmark regularly commented on whether or not they wanted to have sex with the various women who appeared on the televisions positioned in and about the office – a "game" known at Benchmark as "wouldja, wouldja?"

50. On a daily basis, Regan's male co-workers used Benchmark's computers to view pictures of scantily clad and/or naked women, pornographic images and pornographic videos, and to pass along sexualized materials of this nature to each other and clients of the company.

51. For example, Billy Miller, a sales trader who sat next to Regan, regularly emailed links to hardcore pornography videos to other Benchmark employees, including Regan and members of Benchmark's management.

52. On several occasions, Miller sent sexually graphic videos and/or comments to

certain of Regan's clients when covering her desk when she was away from the trading floor.

53. Male employees at Benchmark also constantly graphically discussed sexual acts and women's body parts, including frequently engaging in lengthy and graphic conversations about women's genitalia.

54. Regan's male co-workers routinely referred to women, including Regan and certain of her female colleagues, as "bitches" and "hos".

55. The overtly sexist banter among male employees at Benchmark also included routinely referring to wives and girlfriends as "bitches" and "hos" and telling can-you-top-this type stories about training and dominating their female partners.

56. For example, Robert Bourque ("Bourque") a sales trader who sat next to Regan for much of her tenure at Benchmark often commented on his married life by advising other male colleagues that "it's great [because] I got my bitch trained."

57. Gordon and Messina regularly would participate in the overtly sexualized and misogynistic behavior on Benchmark's trading floor.

58. Among other things, Gordon and Messina frequently would join traders in watching pornographic videos, shouting "wouldja, wouldja" on the trading floor and graphically discussing women's body parts and preferred sexual acts at top volume.

59. In addition, Gordon also organized after-hours trips to strip clubs for him and certain of Benchmark's stock traders and then bragged about his exploits on the trading floor the following day.

60. As a result of the conduct described above, on virtually a daily basis the workplace environment at Benchmark was hostile and oppressive to Regan.

Regan Is Compelled to Participate in the Sexist Conduct at Benchmark

61. From the inception of her employment, Regan was encouraged and, at times, compelled to participate in certain of the sexist and sexualized behavior at Benchmark by members of Benchmark's management, including Gordon and Messina.

62. On numerous occasions, Gordon advised Regan that such conduct was standard operating procedure in the financial services industry and that she needed to play along if she wanted to be successful in the industry.

63. For example, on or about April 4, 2003, under the pretext of going for "a drink downtown" after a work-related function, Gordon brought Regan and other Benchmark employees to a strip club.

64. When Regan stated that she did not want to go into the strip club, Gordon told Regan that she was required to come along.

65. The next morning, Gordon told Regan that her having joined male staff at the strip club was evidence that Regan was beginning to fit in at Benchmark.

66. When Regan responded that she was uncomfortable with having had to attend, Gordon stated that going to "strip clubs" was "just part of how business was done" in the financial services industry.

Regan Increasingly Becomes A Target of Sexual Harassment at Benchmark

67. As Regan increasingly expressed discomfort with the daily sexualized banter in the workplace at Benchmark, Regan's male co-workers began to more regularly make sexualized comments directly to Regan and about Regan.

68. For example, when Regan wore a business suit, male co-workers regularly would ask her, "where are you all ho'd up to go?"

69. When Regan wore jeans or slacks to work, male co-workers would tell her, "that ass is fine" and repeatedly played the song "Baby Got Back" from their computer speakers.

70. Regan was regularly pestered by her male colleagues to play "wouldja, wouldja" during the trading day.

71. When Regan refused to participate, she often became the subject of the game based on what she was wearing and how much trading she had generated that day.

72. Regan regularly was given phone message slips containing lewd and/or inappropriate comments.

73. Male employees of Benchmark also frequently sent sexually explicit emails and pornographic materials to Regan on her office computer, including instant messages with unidentified links to pornographic material.

74. Regan also was required by Gordon to routinely attend firm events, client dinners and charity events where she was expected to flirt with clients and prospective clients, something male traders at Benchmark were not required to do.

Regan Complains to Benchmark Management and
Gevity About the Sexual Harassment at Benchmark

75. The rampant sexual conduct at Benchmark, including but not limited to comments and conduct directed at Regan, made it increasingly difficult for Regan to function efficiently in the workplace.

76. Because the trading room was filled with shouting, cursing, and sounds from pornographic videos, the constant din made it difficult for Regan to make and receive phone calls and, when using the telephone at her desk, she feared that the person on the other end would hear sexually explicit or profane remarks.

77. Regan complained about these circumstances to Gordon and Messina, and other members of management at Benchmark, and repeatedly was told that there was nothing that could be done about the behavior on the trading floor, and that she could use Messina's office or a conference room to make phone calls, if necessary.

78. On at least one occasion, Regan was told that she, "work[ed] with animals, and [she] should get used to it."

79. When Regan expressed dissatisfaction with this response, she was told that behavior on the trading floor was not going to change simply for her, so she better get used to it.

80. In or about early 2005, Regan was subjected to particularly hostile and misogynistic comments from Bourque.

81. For example, Bourque stated to other male traders, "Kerry is like a dog, when you beat it enough it learns."

82. Regan was upset and humiliated by this remark, which Bourque shouted out on the trading room floor in front of a number of sales traders.

83. Regan later approached Gordon and told him about the incident and requested that he take appropriate steps to curtail the sexist conduct and commentary that pervaded the workplace at Benchmark.

84. Gordon shrugged off Regan's complaints, telling her that she was "being too sensitive" and that he "actually" found Bourque's remark "pretty funny."

85. In Spring 2006, Bourque told a story on the trading floor about slapping a woman while in Chicago on a business trip.

86. Bourque concluded the story by turning to Regan and telling her if she was not careful she would be next.

87. In June 2006, at a Benchmark firm event, Bourque commented in front of fifty to sixty clients of Benchmark, some of them Regan's clients, that, "Kerry's ... about as smart as this chair that I am sitting on."

88. A few days later, Regan met with Gordon and Messina and raised concerns about Bourque's comment at the Company event.

89. Regan requested that Gordon and/or Messina speak with Bourque, and that management take prompt action to stop the harassing conduct to which she regularly was being subjected based on her sex.

90. Upon information and belief, Gordon and Messina took no disciplinary action against Bourque for publically denigrating Regan in front of clients at a firm event.

91. In September 2006, Regan traveled to Dallas, Texas to attend the Dallas Traders Convention and visit with a new account, Front Point Partners ("FPP").

92. During the trip, Gordon made it clear to Regan that she was expected to be flirtatious and solicitous with FPP's representatives during a client dinner.

93. Regan was professionally attentive to the FPP clients during dinner and throughout the visit.

94. While in Dallas, Regan did decline to attend a so-called "after-hours" party in Gordon's hotel room.

95. Upon returning to New York, Gordon criticized her for not engaging in sexualized banter with the FPP clients and for failing to attend the after-hours party.

96. Gordon advised Regan that because she had not paid enough attention to the client in Dallas he was removing her from the FPP account.

97. Regan objected, telling Gordon that male traders were not expected to act in a

sexual manner with clients and that requiring her to do so was degrading.

98. Regan emphasized that she wanted to be treated in the same manner, and held to the same standards, as Benchmark's male sales traders.

99. Gordon rejected Regan's complaints, telling her that his decision to remove her from the FPP account stood.

Regan Faces Retaliation for Complaining of
Discrimination and Hostile Work Environment

100. Following Regan's September 2006 complaints to Gordon, Gordon, Messina and other members of Benchmark's management began to subject Regan to intense and unprecedented scrutiny in the workplace.

101. For example, Gordon, Messina and other members of management began monitoring when Regan arrived in the morning and where she went during her lunch break.

102. Gordon told Regan that she needed to inform him whenever she left her desk.

103. None of the male sales traders at Benchmark were monitored during their lunch hours or had to inform management if they left their desk.

104. In addition, Gordon continued to reassign certain of Regan's most profitable accounts to male sales traders and/or allow other traders to solicit business from her accounts.

105. For example, Gordon took Regan off the Morgan Stanley account, an account that she had opened at the Company.

106. Gordon was forced to reinstate Regan to the account after Morgan Stanley contacted Gordon and requested that she be returned to the account.

107. For example, on or about March 11, 2007, without discussion or warning to Regan, Gordon permitted Bourque to begin trading for Perry Capital, a billion-dollar account

that Regan had brought into the Company.

108. Upon information and belief, Bourque solicited business from Perry Capital despite knowing it was Regan's account, in violation of well-established firm protocol.

109. Upon information and belief, in pitching business to Perry Capital, Bourque demeaned Regan's skills and intelligence and told its representatives that she was not up to the task of handling its account.

110. When Regan learned that Bourque was trading in her account, Regan brought the matter to the attention of Gordon and Messina.

111. Although Gordon and Messina conceded that Bourque's conduct was against firm policy, Regan was advised that Bourque would be allowed to continue trading in the account.

112. On or about March 15, 2007, the head trader at Perry Capital told Regan that he planned to call Gordon to request that Regan receive proper credit for new arbitrage flow in the account, as was consistent with Benchmark's practices.

113. The following day, Gordon called Regan into his office and told her he had spoken to the head trader at Perry Capital and refused his request that Regan receive credit for the new arbitrage flow.

114. Gordon also told Regan that he would "be surprised if [Perry Capital] ever trade with you again after my conversation with them."

115. Thereafter, Regan received no more business from Perry Capital.

116. In a meeting later that day with Gordon and Messina, Regan insisted that a discrimination and harassment complaint against Bourque be filed with Benchmark's human resources provider, Gevity, and that appropriate disciplinary action be taken.

117. Gordon tried to dissuade Regan from this demand, telling Regan, "we are not

Morgan Stanley. I am HR."

118. Noting that Benchmark management had taken no action based on her prior expressions of concern about discrimination and harassment in the workplace, Regan refused to relent on her request that Gevity be involved.

119. Gordon responded that he would contact Gevity to conduct an investigation, but that Regan would be the primary subject of that investigation.

120. When Regan asked Gordon why she was being investigated, Gordon told her that the conversation was over, she was to leave his office and that she should "be prepared" for what was to follow.

121. Following her meeting with Gordon and Messina, Regan made multiple attempts via email and telephone to contact Amy Chamberlain, the Gevity representative designated to receive complaints about discrimination at Benchmark.

122. Chamberlain did not return Regan's phone calls or emails.

123. On March 19, 2007, Regan submitted a cease and desist letter to Gordon formally requesting that Benchmark management put a stop to the sexually harassing hostile environment and discriminatory treatment to which she was being subjected at Benchmark based on her sex.

124. The following day, Regan was mocked by several male co-workers, who watched and loudly discussed parodies of sexual harassment education videos on YouTube.

125. On or about March 21, 2007, two days after Regan's letter, Gordon called Regan into his office for an impromptu meeting with him and Donald O'Connor, Benchmark's Chief Compliance Officer, purportedly in furtherance of his investigation.

126. No Gevity representative was present for this meeting, which was conducted by Gordon without privacy in Gordon's office in plain sight of other Benchmark employees, who

were frequently looking in and laughing.

127. During this meeting, Gordon demanded that Regan recite every incident of offensive or discriminatory conduct to which she had been subjected since she commenced employment at Benchmark.

128. Regan was given no opportunity to gather her thoughts, present documents or supply names of witnesses.

129. While Regan recited all of the incidents she could contemporaneously recall, Gordon periodically laughed at her and made light of the incidents she described.

130. At the conclusion of the meeting, Regan stated that she would need additional time to recall additional relevant incidents.

131. However, when Regan approached O'Connor the following day and told him that she wanted to report additional incidents of harassment and discrimination, O'Connor refused to give Regan the opportunity to present this additional information.

132. On April 24, 2007, Regan independently met with Chamberlain, while Chamberlain was present at Benchmark on other business.

133. In that meeting, Regan described the sexually harassing, demeaning and discriminatory behavior to which she was being subjected at Benchmark and the cavalier manner in which Gordon was conducting his "investigation".

134. Upon information and belief, this meeting marked Gevity's first involvement in Regan's complaints, despite its stated role as Benchmark's human resources provider and Regan's co-employer.

135. After listening to Regan's complaints and concerns, Chamberlain offered Regan no substantive response or guidance, stating that Gordon would be handling the matter without

the formal involvement of Gevity.

136. Subsequent to Regan's meeting with Chamberlain, Gevity completely abdicated its human resources and/or co-employer responsibilities in connection with Regan's complaint of discrimination and hostile work environment.

137. Neither Chamberlain nor any other Gevity representative ever contacted Regan again regarding her complaints.

138. Neither Chamberlain nor any other Gevity representative ever advised Regan that Gevity had undertaken investigation into her complaints, or reported on the results of any such investigation.

139. Nor did Chamberlain or any other Gevity representative ever contact Regan to advise her that appropriate corrective or remedial action had been taken.

140. Benchmark also took no corrective or remedial action in response to Regan's formal complaints and request for investigation.

141. In the absence of any such corrective action, on or about April 28, 2007, Regan filed a charge of discrimination with the EEOC.

Benchmark Retaliates against Regan for Filing a Charge of Discrimination with the EEOC

142. Subsequent to Regan's filing with the EEOC, the environment at Benchmark became even more hostile to Regan.

143. Regan was ostracized in the workplace by the majority of the male sales traders and members of Benchmark's management, who refused to interact with Regan on business matters.

144. Simple business-related questions and responses that Regan made to Benchmark management would go ignored for days or weeks at a time, or would not be responded to at all.

145. However, Regan continued to be subjected to sexist and derogatory comments based on her sex, as well as a constant stream of derogatory and sexualized comments about women generally.

146. Regan also was subjected to negative comments and innuendo based on her filing with the EEOC.

147. In addition, Benchmark began to deny Regan portions of commissions due and owing and refused to reimburse her business expenses.

148. For example, on May 3, 2007, Regan's commission payment was incorrectly reduced by over two thousand dollars when she was penalized for a mistake made by Benchmark's head trader.

149. Regan had not been responsible for, or even aware of, the head trader's mistake.

150. Similarly, Benchmark routinely delayed and/or denied approval of Regan's requests for travel and expense money, thereby undermining her ability to pay for dinners and other outings with clients.

151. On May 29, 2007, without explanation, Regan's seat was moved from the center of the trading floor to a desk at the end of the room facing the door.

152. From on or about the day her desk location was reassigned, the computer provided to Regan at her new desk frequently crashed and malfunctioned.

153. These computer problems consistently interrupted Regan's ability to effect trades and maintain direct computer connections to her clients, thereby substantially compromising her ability to service the business of her clients.

154. Although the computer problems at her new work station undermined Regan's ability to efficiently function as a sales trader, Regan's requests for technical support or a new

computer were ignored or rejected by the Company.

155. On May 31, 2007, Regan met with Gordon and told him she believed she was being retaliated against by Benchmark for filing with the EEOC, noting inter alia, the change in her work location and Benchmark's failure to address her ongoing computer problems.

156. Gordon threw Regan out of his office.

157. The following day, Regan received an email from Gordon warning her that if she engaged in any further disruptive conduct her employment would be terminated immediately.

158. On June 11, at a golf outing hosted by Benchmark, Gordon refused to acknowledge Regan or greet a client from Morgan Stanley, Jack Murray, that Regan had invited to the event.

159. Gordon's conduct was so obvious and unusual that Murray commented on it several times.

160. The following day, Murray called Regan and informed her that Gordon had called him to ask if he would consider working with a male sales trader he was considering hiring, instead of Regan.

161. Murray further reported to Regan that he told Gordon that he wanted Regan to stay on the account.

162. Throughout the summer of 2007, Regan was continuously subjected to sexist and demeaning remarks about her intelligence, competence and appearance by male sales traders.

163. These comments were frequently made in the presence of Gordon and/or Messina, who made no effort to stop them or call such conduct into question.

164. Regan also was subjected to numerous derogatory comments about her filing a charge of discrimination with the EEOC.

165. Regan's ability to service her clients' trades continued to be significantly compromised by unaddressed problems with her computer.

166. Without a consistently working computer, Regan often was unable to provide Benchmark's head traders the detailed trading instructions needed for them to execute her trades.

167. Regan continued to advise Gordon and Messina about the ongoing hostile work environment and unequal treatment to which she was being subjected, as well as the technical problems she was having conducting business on behalf of her clients.

168. Notwithstanding the concerns being raised by Regan, Gordon and Messina continued to take no remedial action.

Benchmark Constructively Discharges Regan

169. In or about early September 2007, Benchmark received a copy of a supplemental affidavit submitted to the EEOC providing further factual support for Regan's charge of discrimination.

170. Shortly thereafter, in or about September 13, 2007, Regan was called into a meeting with Gordon and Messina.

171. Gordon handed Regan a white sheet of paper with nothing but an address in Jersey City, New Jersey and a phone number printed on it.

172. Gordon informed Regan that this was the address of her new office location, effective the next morning.

173. Gordon told Regan that she was being transferred to this office location due to her complaints about the environment at Benchmark's New York office.

174. Regan objected to the transfer.

175. Regan stated that her client base and career as a trader was based in New York

City and noted that it would extremely difficult to service that business from a remote location removed from Benchmark's main trading floor.

176. Gordon blithely told Regan, "since you complained about the environment here ... your opportunity is in Jersey City now."

177. In deciding to banish Regan to the Jersey City office, Benchmark made a clear decision to punish Regan for her complaints of discrimination rather than take necessary steps to maintain a workplace environment free from discrimination and sexual harassment in the New York City office.

178. Gordon threatened to call security if Regan did not immediately clean out her desk and leave the building.

179. Before she left the New York office, Regan was asked to turn over her building ID and security pass by O'Connor.

180. The following day, Regan reported to her new office location at 2500 Plaza V, Harborside Financial Center, in Jersey City, New Jersey.

181. Benchmark did not previously have a Jersey City, New Jersey office.

182. Benchmark established this new office location solely for Regan.

183. Benchmark did not consult with Regan on the decision to transfer her out of the New York office to this new office location.

184. The office designated for Regan's use by Benchmark was an approximately eight foot by eight foot windowless room located on the 25th floor of the Harborside Financial Center.

185. There was no Benchmark sign outside the designated office.

186. Benchmark was not listed in Harborside Financial Center's directory.

187. Benchmark's website made no reference to a Benchmark location in Jersey City,

New Jersey.

188. The Jersey City office was completely empty except for a disconnected computer, a rudimentary desk and chair, and a file cabinet.

189. As constituted, it was virtually impossible for Regan to conduct business out of the new office.

190. In the Jersey City office, Regan was totally isolated from her colleagues, lacked the necessary electronic connections to Benchmark's trading operations to conduct business and/or make trades on behalf of her clients, and received none of the institutional support necessary for her to generate revenue for herself and for the Company.

191. Regan emailed Gordon and Messina and requested several items that she needed in order to keep her business running, including without limitation, linkage to Benchmark's server and trading platform, a time stamp, buy and sell tickets, and basic office supplies.

192. Regan also requested that Benchmark assign a licensed trader to the Jersey City office, since she could not execute trades without one.

193. Even after a computer was set up in Jersey City, Regan experienced repeated problems accessing Benchmark's server, its trading system and Microsoft Outlook.

194. This lack of access significantly disrupted Regan's ability to conduct business and earn commissions.

195. Regan also found herself cut off from news and conversations about business developments and daily transactions, which further inhibited her ability to service her business.

196. The only licensed trader assigned by Benchmark management to work with Regan was Michael Mason, one of the primary offenders in the creation of a hostile work environment for Regan.

197. Regan had to direct her trades by telephone or instant message, which inhibited the timely execution of trades, thereby further damaging Regan's business.

198. In addition, numerous errors were made in booking Regan's trades, resulting in related errors in Regan's clients daily profit and loss account balances.

199. Given the problems inherent in her new business circumstances, many of Regan's clients expressed displeasure with her relocation and stopped trading or traded less.

200. This diminution in trades significantly damaged Regan's ability to earn commissions.

201. After her "transfer" to Jersey City, Regan's phone calls and emails to Benchmark management about business matters routinely went unanswered.

202. For example, despite numerous requests to Benchmark management, Regan did not receive formal commission runs.

203. On September 25, 2007, Regan emailed Gordon, Messina, and other members of Benchmark's management regarding the New York office's non-responsiveness to her emails and calls.

204. In that email, Regan advised that her commissions were decreasing dramatically as a direct result of the working conditions in the Jersey City office, describing her circumstances as being "fired without actually being fired."

205. In October 2007, the manager of the building company that managed the Harborside Financial Center advised Regan that Benchmark had only leased her office through October.

206. In November 2007, Benchmark transferred Regan to a different office location in Jersey City.

207. At or about this time, Regan was removed from Benchmark's email distribution list.

208. After being moved to a new location in Jersey City, Regan again asked Gordon, Messina and O'Connor to transfer her back to New York City.

209. That request was denied.

210. Given the myriad problems Regan faced in trying to conduct business from Jersey City, her book of business and earned commissions continued to steadily erode.

211. Due to the decimation of her earnings and business prospects, Regan experienced acute feelings of depression and anxiety.

212. These feelings were exacerbated by the isolation, helplessness and humiliation to which she was being subjected by being forced to try to function professionally in a totally dysfunctional and oppressive workplace environment.

213. In November 2007, Regan was diagnosed with severe depression.

214. In or about late November 2007, Regan's doctor advised Regan she needed to take a medical leave of absence from Benchmark.

215. In early December 2007, Regan's doctor advised Benchmark that Regan needed to take a medical leave as a result of "a major depressive episode due to intolerable work conditions and stress".

216. Because Regan was paid by Benchmark on a commissions only basis, as a result being forced to take medical leave Regan ceased to have earnings.

217. As a result of the loss of earnings, Regan began to suffer serious economic hardship, including being unable to pay her rent, car payments and other monthly bills.

218. Regan's steadily worsening financial condition and professional prospects further

exacerbated her depression.

219. During this period, Benchmark made no efforts to address any of the workplace issues responsible for Regan's failing health or otherwise work with her to facilitate her return to work.

220. In or about late June/early July 2008, Regan, in consultation with her doctor, concluded that she could not return to work at Benchmark given the working conditions there.

221. On July 11, 2008, Regan emailed a letter to Gordon and Messina stating that Benchmark had constructively discharged her from employment.

222. After receiving Regan's constructive discharge notice, Benchmark maliciously marked Regan's Securities Industry Form U5 with an optional notation making negative reference to Regan's medical condition.

223. Subsequent to her constructive discharge, and Benchmark's filing of her U5, Regan has been unable to secure another sales trading position despite reasonably diligent efforts to obtain such a position.

Gevity Acquiesces In and Supports Benchmark's Discriminatory and Retaliatory Conduct

224. At all times after Regan complained directly to Gevity about the discrimination and hostile work environment to which she was being subjected at Benchmark, Gevity took no action to ensure that Regan was provided a discrimination and harassment free workplace.

225. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, Gevity took no action to independently investigate Regan's claims of discrimination and hostile work environment.

226. Upon information and belief, despite its human resource functions and status as a

co-employer of Regan, Gevity failed to initiate and/or recommend disciplinary action against Benchmark personnel based on their harassment of Regan.

227. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, Gevity took no action to redress the discriminatory and retaliatory conduct to which Ms. Regan was being subjected.

228. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, Gevity failed to prevent Benchmark from retaliating against Regan for having made complaints about discrimination in the workplace.

229. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, Gevity took no action to prevent Benchmark from transferring Regan to the windowless office in Jersey City where she was the sole Benchmark employee.

230. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, and contrary to its mandate to provide Regan with a discrimination free workplace, Gevity acquiesced in and tacitly endorsed Benchmark's discriminatory treatment of Regan.

231. Upon information and belief, despite its human resource functions and status as a co-employer of Regan, and contrary to its mandate to prevent retaliation against an employee raising concerns about discrimination, Gevity acquiesced in and tacitly endorsed an escalating series of retaliatory reprisals against Regan that culminated in her constructive discharge after she was banished to a windowless office in Jersey City.

232. As a consequence of the foregoing, defendants have discriminated against and retaliated against Regan in the terms and conditions of her employment and, thereby, have substantially interfered with Regan's continuing opportunities for professional advancement,

career development, recognition, increased compensation and other benefits and perquisites of employment.

233. As a result of defendants' discriminatory and retaliatory conduct, Regan has suffered a loss of income, professional stature and benefits.

234. As a result of defendants' discriminatory and retaliatory conduct, Regan has sustained serious pain and suffering, and severe mental and emotional harm and distress.

235. The aforesaid acts and conduct by defendants were performed willfully, intentionally, maliciously and with reckless indifference to Regan's protected rights.

**COUNT ONE**

236. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 235 above.

237. Defendants Benchmark and TriNet have discriminated against plaintiff on account of her sex with respect to the terms, conditions and privileges of her employment in violation of Title VII.

238. As a result of defendants' discrimination against her, Regan has suffered damage, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

**COUNT TWO**

239. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 238 above.

240. Defendants Benchmark and TriNet have retaliated against plaintiff for opposing discrimination in the workplace in violation of in violation of Title VII.

241. As a result of defendants' discrimination against her, Regan has suffered damage,

including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

**COUNT THREE**

242. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 241 above.

243. As a result of the aforementioned actions, defendants Benchmark and TriNet have discriminated against plaintiff on account of her sex with respect to the terms, conditions and privileges of her employment in violation of the New York City Administrative Code.

244. As a result of defendants' discrimination against her, Regan has suffered damage, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

**COUNT FOUR**

245. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 244 above.

246. As a result of the aforementioned actions, defendants Benchmark and TriNet have retaliated against plaintiff for opposing discrimination in the workplace in violation of the New York City Administrative Code.

247. As a result of defendants' discrimination against her, Regan has suffered damage, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

**COUNT FIVE**

248. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 247 above.

249. As a result of the aforementioned actions, defendants Gordon and Messina have violated the New York City Administrative Code § 8-107(6) by aiding, abetting, inciting and coercing the unlawful discrimination and retaliation outlined herein.

250. As a result of defendants Gordon and Messina aiding, abetting, inciting and coercing unlawful discrimination and retaliation against plaintiff, Regan has suffered damage, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

WHEREFORE, plaintiff Kerry Anne Regan respectfully requests that this Court grant judgment for plaintiff and award plaintiff the following relief against defendants:

(1) Order defendants to make plaintiff whole by providing: (a) back pay with interest based on plaintiff's appropriate compensation had she not been discriminated against; (b) front-pay; and (c) reimbursement for lost benefits, pension, social security, experience, training opportunities, and other benefits; in an amount to be shown at trial but believed to be not less than $2,000,000;

(2) Grant plaintiff compensatory damages for her emotional pain and suffering, inconvenience, mental anguish and humiliation, and damage to reputation and career in an amount not less than $1,000,000;

(3) Grant plaintiff punitive damages in an amount not less than $2,000,000.00;

(4) Grant plaintiff her attorneys' fees, costs and disbursements;

(5) Prejudgment interest; and

(6) Grant such other and further relief to the plaintiff as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury of all issues properly triable by a jury.

Dated: New York, New York
June 29, 2010

BANTLE & LEVY LLP

By: ______________________
Robert L. Levy (RL 1633)
817 Broadway
New York, New York 10003
(212) 228-9666
Attorneys for Plaintiff