UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/1/12

---

KERRY ANNE REGAN,

Plaintiff,

-against-

No. 11 Civ. 4511 (CM)

THE BENCHMARK COMPANY LLC, et al.,

Defendants.

---

**DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

McMahon, J.:

## INTRODUCTION

Kerry Anne Regan ("Regan" or "Plaintiff") commenced this action against the Benchmark Company LLC ("Benchmark"), TriNet Group, Inc., Adam Gordon ("Gordon"), and Richard Messina ("Messina"), alleging employment discrimination, hostile work environment, and retaliation based on her gender under Title VII and the New York City Human Rights Law ("NYCHRL"). Regan also alleges that defendants Gordon and Messina, as the principals of Benchmark, aided and abetted violations of the NYCHRL.

Currently before the Court is a motion by Defendants Benchmark, Gordon, and Messina (collectively, "Defendants") to dismiss Regan's Title VII claims as time-barred and, alternatively, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). If Regan's Title VII claims are dismissed, Defendants argue that Regan's NYCHRL claims also should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1), because this Court would lack subject matter jurisdiction over the NYCHRL claims. Alternatively, Defendants seek

dismissal of Regan's NYCHRL claims on the grounds that Regan fails to state valid claims under the NYCHRL and that the claims are time-barred. Regan has opposed Defendants' motion and, in the alternative, moves for leave to replead.

For the following reasons, Defendants' motion to dismiss is DENIED. The motion for leave to replead is denied as moot.

**BACKGROUND**

Regan worked as an institutional sales trader for Benchmark from March 2003 until July 2008. (Compl. ¶¶ 26, 220-21.) Benchmark is a broker dealer serving institutional and private investment clients. (Id. ¶ 10.) During Regan's employment, defendants Gordon and Messina were responsible for running Benchmark's New York City office, including the supervision of Regan. (Id. ¶ 28.)

In her complaint, Regan alleges that, from virtually the commencement of her employment at Benchmark, she was subjected to discriminatory treatment based on her sex. (Id. ¶ 36.) Regan claims that she was not afforded the same professional advantages as the male traders at Benchmark. (Id. ¶¶ 37-42.) For example, male traders had access to more advanced trading systems and tools, had virtually unlimited discretion to distribute firm research, and received extensive senior management support. (Id. ¶ 37.) Regan was denied these advantages. (Id. ¶ 38.) In addition, unlike male traders, Regan was forced to share her client accounts with other traders. (Id. ¶¶ 39-41.) Male traders were also permitted to "poach" on Regan's accounts, a practice otherwise prohibited at Benchmark. (Id. ¶ 42.) As a result, Regan's commission-based compensation did not fully reflect the amount of business that she generated for Benchmark. (Id. ¶¶ 29, 40.)

In addition to discriminatory treatment, Regan's complaint alleges that she was subjected to a hostile work environment throughout her employment. Regan states that the Benchmark workplace was pervasively sexist and male traders frequently made "negative, sexually graphic and objectifying comments about women." (Id. ¶ 43.) Specifically, Regan claims that male co-workers regularly used binoculars to look in on women at a college dormitory across the street from Benchmark's office. (Id. ¶ 45.) While observing these women, Benchmark employees commented on the females' looks and actions and discussed sexual acts that they wanted to perform on them. (Id. ¶ 46.) In addition, Benchmark male employees often played a game known as "wouldja, wouldja?" during which they would comment on whether they wanted to have sex with women who appeared on the televisions in the Benchmark office. (Id. ¶ 49.) They also commonly viewed pornographic photographs and videos on Benchmark computers and emailed links to this sexual content to clients and Benchmark co-workers, including Regan and members of Benchmark's management. (Id. ¶¶ 50-52.) Conversations among Benchmark employees constantly involved graphic discussion of sexual acts and female body parts, and male employees commonly referred to women as "bitches" and "hos." (Id. ¶¶ 53-55.)

Over time, as Regan expressed that she was uncomfortable with the sexualized work environment at Benchmark, her co-workers began to make more inappropriate remarks toward and about Regan. (Id. ¶ 67.) For example, when Regan wore a business suit to the office, male co-workers would ask her, "Where are you all ho'd up to go?" (Id. ¶ 68.) When Regan wore pants to work, her co-workers would say things like "that ass is fine," and repeatedly play the song "Baby Got Back" on their computers. (Id. ¶ 69.) Male co-workers often pestered Regan to join them in playing "wouldja, wouldja," and would make Regan the subject of the game when she refused. (Id. ¶ 70.) Male employees also regularly left Regan phone message slips containing

lewd comments, and sent her emails and instant messages on her office computer with links to sexually explicit material. (Id. ¶¶ 72-73.)

Regan's complaint states that this sexualized environment began to interfere with her ability to perform efficiently at work. (Id. ¶ 75.) For example, Regan felt uncomfortable making work-related telephone calls from her desk due to the loud profanity and sounds from pornographic videos in the background. (Id. ¶ 76.) When Regan complained about these conditions to Gordon, Messina, and other Benchmark managers, they told her that they could not do anything to change employee behavior on the trading floor and that she should get used to it. (Id. ¶¶ 77-79.)

Even when undesirable employee conduct on the trading floor was directed at Regan, Benchmark management did not respond to Regan's complaints. For example, in early 2005 Regan's co-worker Robert Bourque ("Bourque") announced to the floor that Regan "is like a dog, when you beat it enough it learns." (Id. ¶ 81.) Regan reported this incident to Gordon, but he did nothing in response and told Regan that she was "being too sensitive." (Id. ¶¶ 83-84.) Similarly, in June 2006, at a Benchmark firm event, Bourque commented that Regan was "about as smart as this chair that I am sitting on." (Id. ¶ 87.) Bourque made this statement in front of Benchmark employees and clients. (Id.) Once again, when Regan complained to Gordon and Messina about Bourque's comment, they took no disciplinary action. (Id. ¶¶ 88-90.)

Regan's complaint further states that Benchmark management, including Gordon and Messina, participated in and encouraged her to take part in the sexist work environment. (Id. ¶¶ 57-58, 61.) Regan alleges that Gordon told her on several occasions that such conduct was standard in the financial services industry and that she needed to play along if she wanted to be successful. (Id. ¶ 62.) Regan also alleges that Gordon often organized after-hours trips to strip

clubs for him and Benchmark co-workers, which Gordon bragged about at work. (Id. ¶ 59.) On or about April 4, 2003, after a work-related function, Gordon took Regan and other Benchmark employees to a strip club. (Id. ¶ 63.) When Regan told Gordon that she did not want to go to a strip club, he replied that her attendance was required. (Id. ¶ 64.) At work the next day, Gordon informed male employees that Regan's trip to the strip club was evidence that she was beginning to fit in at Benchmark. (Id. ¶ 65.) When Regan expressed that she was uncomfortable with having gone to the strip club, Gordon stated that going to strip clubs was "just part of how business was done." (Id. ¶ 66.)

In addition, Regan alleges that Gordon routinely required her to attend firm events at which she was expected to flirt with clients and prospective clients. (Id. ¶ 74.) On one occasion, in September 2006, Regan and Gordon went to Dallas, Texas to attend a traders convention and meet with a new client. (Id. ¶ 91.) During the trip, Gordon told Regan that he expected her to be flirtatious with representatives of the new client. (Id. ¶ 92.) Although Regan was professionally attentive to the clients, she did not behave flirtatiously nor did she attend an "after-hours" party with the clients in Gordon's hotel room. (Id. ¶¶ 93-94.) When they returned to New York, Gordon criticized Regan for failing to flirt with the clients as he had requested. (Id. ¶ 95.) As a result, Gordon removed Regan from this client account. (Id. ¶ 96.) Gordon ignored Regan's argument that male traders were not expected to flirt with clients and that she wanted equal treatment. (Id. ¶¶ 97-99.)

Following Regan's September 2006 complaints to Benchmark management, she claims that she was subjected to even more discriminatory treatment in the workplace. (Id. ¶ 100.) For example, Gordon, Messina, and other Benchmark managers proceeded to closely monitor Regan while she was at the office and during her lunch break. (Id. ¶ 101.) Gordon even told Regan to

inform him any time that she left her desk. (Id. ¶ 102.) Benchmark management did not monitor any of the male employees in a similar way. (Id. ¶ 103.) Gordon also reassigned a number of Regan's client accounts to male traders and/or allowed male traders to solicit business from her accounts, although this practice was against firm policy. (Id. ¶¶ 104, 108.) Specifically, in March 2007, Regan discovered that Bourque had been soliciting business from Perry Capital, a billion dollar account that Regan had obtained for Benchmark. (Id. ¶ 107.) When Regan brought the matter to the attention of Gordon and Messina, they conceded that Bourque's trading practices were against firm policy but also told Regan that they would allow Bourque to continue to trade on the Perry Capital account. (Id. ¶¶ 110-11.) A few days later, in another meeting with Gordon and Messina, Regan requested that they file a discrimination and harassment complaint against Bourque with Benchmark's human resources provider. (Id. ¶¶ 112-13, 116.) Gordon and Messina refused to do so and, after Regan continued to demand that they take action, they contacted human resources to investigate Regan. (Id. ¶¶ 118-19.) They did not offer a reason as to why Regan was the subject of the human resources investigation. (Id. ¶ 120.)

Shortly thereafter, on March 19, 2007, Regan sent Gordon a cease and desist letter formally requesting that Benchmark management put a stop to the sexually pervasive work environment and discriminatory treatment to which Regan was subjected. (Id. ¶ 123.) The next day, several male co-workers mocked Regan and watched parodies of sexual harassment education videos on their office computers. (Id. ¶ 124.) On or about March 21, 2007, Gordon called Regan into a meeting with him and Donald O'Connor ("O'Connor"), Benchmark's Chief Compliance Officer. (Id. ¶ 125.) No human resources representatives were present. (Id. ¶ 126.) During the meeting, Gordon asked Regan to list all of the offensive and discriminatory incidents that had taken place during her time at Benchmark. (Id. ¶ 127.) As Regan recalled certain

incidents, Gordon laughed at her and made light of the incidents she described. (Id. ¶ 129.) At the end of the meeting, Regan stated that she needed more time to recall other incidents. (Id. ¶ 130.) When Regan approached O'Connor the next day to report these additional incidents, however, he refused to speak with her. (Id. ¶ 131.) Because Benchmark took no corrective action following Regan's complaints, on or about April 28, 2007, Regan filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶¶ 140-41.)

Regan alleges that after her EEOC filing, Benchmark management subjected her to further discriminatory treatment that interfered with her job performance. Specifically, Benchmark denied Regan portions of her commissions and refused to reimburse her business expenses. (Id. ¶ 147.) Also, on May 29, 2007, Regan was moved to a different desk on the trading floor with a malfunctioning computer that interrupted her ability to trade and to communicate with clients. (Id. ¶¶ 152-53.) Benchmark refused to offer Regan technical support, despite her requests. (Id. ¶ 154.) As a result, on May 31, 2007, Regan met with Gordon and told him that she believed Benchmark was retaliating against her because of her EEOC filing. (Id. ¶ 155.) Gordon threw Regan out of his office and warned her that further disruptive conduct would lead to her termination. (Id. ¶¶ 156-57.)

In addition, many of Benchmark's male sales traders and managers refused to interact with Regan on business matters following her EEOC charge. (Id. ¶¶ 142-44.) Male co-workers continued to regularly make sexist and sexualized comments toward Regan and about women in general. (Id. ¶ 145.) They also made negative comments regarding Regan's EEOC filing. (Id. ¶ 146.)

Regan claims that this hostile and discriminatory work environment continued throughout the summer of 2007, as did her office computer problems. (Id. ¶¶ 162-66.) Although Regan

repeatedly expressed her concerns about these issues to Gordon and Messina, they did not take any remedial action. (Id. ¶¶ 167-68.)

In or about early September 2007, Benchmark received a copy of a supplemental affidavit that Regan had submitted to the EEOC providing further support for her discrimination claim. (Id. ¶ 169.) On September 13, 2007, Gordon and Messina called Regan into a meeting during which Gordon gave Regan a piece of paper with a Jersey City, New Jersey, address and telephone number listed on it. (Id. ¶¶ 170-71.) Gordon informed Regan that the address was her new office location, effective the following morning. (Id. ¶ 172.) He told Regan that the transfer was in response to her complaints about the environment at Benchmark's New York City office. (Id. ¶ 173.) Regan objected to the transfer, noting that, because her clients and career are based in New York City, it would be difficult for her to effectively serve her clients from a New Jersey office. (Id. ¶¶ 174-75.) Benchmark transferred her nonetheless. (Id. ¶ 176.)

The next day, Regan reported to Benchmark's Jersey City, New Jersey, office. (Id. ¶ 180.) Benchmark did not previously have this office location, but established this office solely for Regan. (Id. ¶¶ 181-82.) There was no Benchmark sign outside of the office, nor was Benchmark listed in the directory of the business center where it was located. (Id. ¶¶ 185-86.) Benchmark's company website also made no mention of a Jersey City office. (Id. ¶ 187.)

The Jersey City office was approximately an eight foot by eight foot windowless room. (Id. ¶ 184.) It contained only a disconnected computer, a desk and chair, and a file cabinet. (Id. ¶ 188.) Regan emailed Gordon and Messina several times requesting equipment and supplies necessary in order to effectively conduct business. (Id. ¶¶ 191-92.) Although Regan's computer was ultimately set up, she experienced difficulty connecting to Benchmark's server, which interfered with her ability to do business and earn commissions. (Id. ¶¶ 193-94.) Regan's

business also suffered due to her lack of connection to her colleagues, which cut her off from relevant business discussions. (Id. ¶ 195.) In addition, Regan had to direct trades by telephone and instant message. (Id. ¶ 197.) Because of this indirect method of doing business, Regan's trades were often delayed. (Id.) Similarly, numerous errors were made in booking Regan's trades, which led to inaccuracies in Regan's clients' daily profit and loss account balances. (Id. ¶ 198.) Not surprisingly, a number of Regan's clients were dissatisfied with her services following her transfer to Jersey City and stopped trading or traded less. (Id. ¶ 199.) This decrease in trading activity significantly damaged Regan's ability to earn commissions. (Id. ¶ 200.)

Regan's transfer to Jersey City also further disconnected her from Benchmark management. For example, after her transfer, Regan's phone calls and emails to Benchmark management about business matters frequently went unanswered. (Id. ¶ 202.) On September 25, 2007, Regan emailed them to complain about this non-responsiveness and to report the dramatic decrease in her commissions as a result of her transfer. (Id. ¶¶ 203-04.) In the email, Regan described her circumstances as being "fired without actually being fired." (Id. ¶ 204.)

In November 2007, Benchmark transferred Regan to a different office location in Jersey City, New Jersey. (Id. ¶ 206.) Around this time, Regan was removed from Benchmark's email distribution list. (Id. ¶ 207.) After this second transfer, Regan asked Gordon, Messina, and O'Connor to transfer her back to Benchmark's New York City office, but they denied her request. (Id. ¶¶ 208-09.) In the new Jersey City office location, Regan continued to experience the same issues that interfered with her ability to conduct business. (Id. ¶ 210.) Consequently, Regan's earned commissions steadily declined. (Id.)

Regan claims that, because of her decreased earnings and business prospects, she began to suffer from depression and anxiety. (Id. ¶ 211.) In November 2007, Regan was diagnosed with

severe depression, and, in or about late November 2007, her doctor advised her to take a medical leave of absence from Benchmark. (Id. ¶¶ 213-14.) In early December 2007, Regan's doctor informed Benchmark that Regan needed to take a medical leave as a result of "a major depressive episode due to intolerable work conditions and stress." (Id. ¶ 215.) Because Benchmark compensated Regan based solely on commissions, she earned no income during her medical leave. (Id. ¶ 216.) In or about late June or early July of 2008, Regan and her doctor concluded that Regan was unable to return to Benchmark due to the work environment. (Id. ¶ 220.) On July 11, 2008, Regan emailed Gordon and Messina stating that Benchmark had constructively discharged her from employment. (Id. ¶ 221.)

Thereafter, on October 28, 2008, Regan filed a second charge with the EEOC, alleging that she was "involuntarily transferred" to Benchmark's Jersey City office in retaliation for her objections to the discriminatory treatment to which she was subjected at Benchmark. (See Affirmation of Robert L. Levy, dated September 13, 2011 ("Levy Aff.") Ex. 1.) The October 2008 charge also claims that Regan was constructively discharged as a result of the ongoing hostile work environment and retaliatory treatment at Benchmark. (Levy Aff. Ex. 1.)

After investigating Regan's claims, the EEOC issued a Determination, dated July 8, 2010, outlining its findings. (Compl. ¶ 5b; see Levy Aff. Ex. 2.) The Determination stated that there was reasonable cause to believe: (1) that Defendants had violated Regan's rights under Title VII; (2) that Regan and other female employees at Benchmark were victims of a sexually hostile work environment; (3) that Defendants' actions, including transferring Regan to the Jersey City office, were in retaliation for Regan's protected activity; and (4) that Regan was constructively discharged because her work conditions "were so intolerable that a reasonable

person under the circumstances would have felt compelled to resign." (Compl. ¶ 5b; Levy Aff. Ex. 2.)

After unsuccessful efforts to settle the dispute between Regan and Defendants, the EEOC issued a Notice of Right to Sue, dated March 31, 2011. (Compl. ¶ 5c.)

Regan filed her complaint in this action on June 30, 2011, within 90 days of her receipt of the EEOC's Notice of Right to Sue. (Id. ¶ 5d.) The complaint alleges discrimination, hostile work environment, and retaliation based on gender under both Title VII and the NYCHRL, as well as aiding and abetting of discrimination in violation of the NYCHRL by Gordon and Messina. (Id. ¶¶ 2, 237, 240, 243, 246, 249.)

## DISCUSSION

I will first discuss whether to dismiss Regan's Title VII claims as time-barred or for failure to state a claim pursuant to Rule 12(b)(6). Title VII claims and NYCHRL claims have the same standard of review for purposes of Rule 12(b)(6) motions. Ochei v. The Mary Manning Walsh Nursing Home Co., Inc., 10 Civ. 2548, 2011 WL 744738, at *3 (S.D.N.Y. Mar. 1, 2011) (citations omitted). Therefore, because the Title VII claims here will not be dismissed pursuant to Rule 12(b)(6), there is no need to include a separate discussion of the NYCHRL claims under the Rule, as both sets of claims survive the Rule 12(b)(6) motion. However, Defendants also advance alternative theories for dismissal of Regan's NYCHRL claims, and I will address these arguments following the discussion of the Title VII claims.

### A. Standard of Review for a Motion to Dismiss

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." Id. at 570; Iqbal, 129 S. Ct at 1950–51.

In Swierkiewicz v. Sorema, 534 U.S. 506 (2002), the Supreme Court held that plaintiffs need not plead a prima facie discrimination claim to withstand Rule 12(b)(6) dismissal. Twombly explicitly left Swierkiewicz intact. Twombly, 550 U.S. at 555. Reconciling the two, "a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, 'the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim.'" Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009)).

Finally, in deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003); see also Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007).

B. Regan's Title VII Claims Are Not Time-Barred

Title VII claims "must be filed with an administrative agency [such as] the EEOC . . . within 300 days after the alleged unlawful employment practice occurred." Benardo v. Am. Idol Prods., Inc., 11 Civ. 0625, 2011 WL 2565489, at *4 (S.D.N.Y. June 21, 2011). Therefore, Defendants argue that, because Regan filed a charge of discrimination with the EEOC on or about April 28, 2007, any incidents that allegedly occurred before July 2, 2006 are time-barred. (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs. Mot.") at 7.) This argument fails.

As Defendants point out, under the "continuing violation" doctrine, "because hostile work environment by its nature involves repeated conduct . . . a court looks to the entire time frame when the hostile environment existed, as long as one act contributing to the claim occurred within the 300 day filing period." Benardo, 2011 WL 2565489, at *4 (citing Amtrak v. Morgan, 536 U.S. 101, 115 (2002)); (see Defs. Mot. at 7 n.3). Defendants do not contend that all of Regan's claims are time-barred, but argue that only the alleged incidents occurring before July 2, 2006 are time-barred. (Defs. Mot. at 7.)

However, Regan sets forth a litany of allegations that would establish a hostile work environment beginning well before the 300 day filing period. For example:

- Throughout Regan's employment at Benchmark, male traders frequently made "negative, sexually graphic and objectifying comments about women." (Compl. ¶ 43.) Specifically, conversations among Benchmark employees constantly involved graphic discussion of sexual acts and female body parts, and male employees commonly referred to women as "bitches" and "hos." (Id. ¶¶ 53-55.)
- Male co-workers regularly used binoculars to look in on women at a college dormitory across the street from Benchmark's office. (Id. ¶ 45.) While observing these women,

Benchmark employees commented on the females' looks and actions and discussed sexual acts that they wanted to perform on them. (Id. ¶ 46.)

- Benchmark male employees often played a game known as "wouldja, wouldja?" during which they would comment on whether they wanted to have sex with women who appeared on the televisions in the Benchmark office. (Id. ¶ 49.) They often pestered Regan to join them in playing, and would make her the subject of the game when she refused. (Id. ¶ 70.)
- Male traders commonly viewed pornographic photographs and videos on Benchmark computers and emailed links to this sexual content to clients and Benchmark co-workers, including Regan and members of Benchmark's management. (Id. ¶¶ 50-52.)
- Male co-workers regularly made inappropriate comments about Regan's physical appearance. For example, when Regan wore a business suit to the office, they would ask her, "Where are you all ho'd up to go?" (Id. ¶ 68.) When she wore pants to work, her co-workers would say things like "that ass is fine," and repeatedly play the song "Baby Got Back" on their computers. (Id. ¶ 69.)
- Male employees often left Regan phone message slips containing lewd comments, and sent her emails and instant messages on her office computer with links to sexually explicit material. (Id. ¶¶ 72-73.)
- On or about April 4, 2003, Gordon required Regan to join him and other Benchmark employees on a trip to a strip club, even though Regan expressed that she was uncomfortable with this situation. The next day, Gordon told Benchmark co-workers that Regan's attendance at the strip club was evidence that she was beginning to fit in, and he

informed Regan that going to strip clubs was "just part of how business was done." (Id. ¶¶ 63-66.)

- In early 2005 and June 2006, Regan's co-worker, Bourque, made insulting comments about Regan in front of Benchmark employees and clients. When Regan complained about these incidents to Benchmark management, Gordon and Messina took no disciplinary action. (Id. ¶¶ 81, 83-84, 87-90.)
- In September 2006, at a traders convention in Dallas, Texas, Gordon told Regan to act flirtatiously toward new clients. When Regan did not do so, Gordon removed her from this client account. (Id. ¶¶ 91-96.)
- After Regan complained about the September 2006 incident, Gordon, Messina, and other Benchmark managers proceeded to closely monitor Regan while she was at the office and during her lunch break. (Id. ¶¶ 100-01.) Gordon even told Regan to inform him any time that she left her desk. (Id. ¶ 102.) Benchmark management did not monitor any of the male employees in a similar way. (Id. ¶ 103.)

As these allegations reflect, Regan has alleged at least one timely act contributing to her hostile work environment claim. The claim of hostile work environment extending from the beginning of her employment is, therefore, not barred by limitations.[1]

C. Regan Has Stated Plausible Title VII Claims

**1. Discrimination**

In order to make out a prime facie case of employment discrimination based on gender under Title VII, a plaintiff must show: "(1) membership in a protected group; (2) qualification

---

[1] Even if Regan's hostile work environment claim only extended back to July 2, 2006, evidence about these incidents would be admissible to prove the existence of a hostile work environment during that period. These incidents are also relevant evidence in connection with Regan's other claims of discrimination and retaliation, which are not "continuing violations."

for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Swierkiewicz, 534 U.S. at 510 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). As noted above, Plaintiff need not plead a prima facie case at the pleading stage. However, a complaint containing factual allegations that preclude the existence of any element of a prima facie case cannot possibly raise a claim that is "facially plausible."

Defendants argue that Regan has failed to plead prongs three and four of a Title VII employment discrimination claim and that she has failed to exhaust her administrative remedies. I reject these contentions.

a. *Plaintiff Has Exhausted Her Administrative Remedies*

As a precondition to filing a Title VII suit in federal court charging gender discrimination, plaintiff must first exhaust her available administrative remedies by filing a timely complaint with the EEOC or other local administrative agency. Canales-Jacobs v. N.Y. State Office of Court Admin., 640 F. Supp. 2d 482, 502 (S.D.N.Y. 2009) (citations omitted). Only claims explicitly raised before an administrative agency are properly before a district court, unless the claims that were not previously raised are "reasonably related" to those filed with the administrative agency. Id. at 503. In determining whether claims are reasonably related, the primary focus is "on the factual allegations made in the [division complaint] itself, describing the discriminatory conduct about which plaintiff is grieving." Id. (quoting Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003)) (internal quotations omitted).

Defendants argue that, because Regan's April 28, 2007 EEOC charge does not mention discrimination, this claim is unrelated and should be dismissed. (Defs. Mot. at 12; see Affirmation of Katherine B. Harrison, dated August 19, 2011 ("Harrison Aff.") Ex. A.) But the

reasonably related standard is meant to be "a loose pleading standard for EEOC complaints." Pilgrim v. McGraw-Hill Cos., Inc., 599 F. Supp. 2d 462, 491 (S.D.N.Y. 2009) (citing Deravin, 335 F.3d at 201). While the complaints in the 2007 EEOC charge focus on the alleged hostile work environment and retaliation, the charge also refers to "sexism" in the workplace and recalls specific instances in which male co-workers commented on Regan's appearance and suggested that Regan attract clients with sexual favors. (See Harrison Aff. Ex. A.) Read liberally, these complaints reasonably relate to Regan's discrimination claim, because they relate to circumstances that support an inference of discrimination based on gender. Therefore, Regan's disparate treatment claim is properly before this Court under Title VII.

b. *Plaintiff Properly Pleads an Adverse Employment Action*

An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Benardo, 2011 WL 2565489, at *3 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Defendants claim that Regan has not met this standard, because any potential adverse employment action that she alleges took place after her EEOC charge and is therefore retaliatory in nature. (Defs. Mot. at 11.) Specifically, Defendants point to Regan's claims regarding her transfer to Benchmark's Jersey City office, an event which took place after her April 28, 2007 EEOC charge and which Regan characterizes as retaliatory. (Id.)

Defendants ignore other factual allegations set forth in Regan's complaint that occurred before either of her filings with the EEOC. For example, Regan claims that Benchmark management reassigned a number of her client accounts to male traders and/or allowed male traders to solicit business from her accounts, although this practice was against firm policy.

(Compl. ¶¶ 104, 108.) Given the fact that Regan's compensation at Benchmark was based solely on commission, such actions by Benchmark management caused "a significant change in benefits." Benardo, 2011 WL 2565489, at *3 (citing Burlington, 524 U.S. at 761).

Accordingly, Regan has sufficiently pled that she suffered an adverse employment action.

c. *Plaintiff Properly Pleads Discrimination Because of Her Gender*

Defendants argue that Regan has failed to allege that she was treated differently *because of her gender*. As the Second Circuit has noted, "The *sine qua non* of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be *because of* sex.'" Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (quoting Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 189 (2d Cir.2001)).

Despite Defendants' arguments, Regan alleges a number of incidents involving treatment that could only be a result of her gender. For example, Regan alleges that male co-workers regularly commented on her appearance and body parts, referred to her as a "bitch" or a "ho," and made her the subject of "wouldja, wouldja," during which they discussed whether they wanted to have sex with her. (Compl. ¶¶ 54, 68-71.) Regan also claims that Benchmark management expected her to flirt with clients and prospective clients, while male employees were not asked to do so. (Id. ¶¶ 74, 91-99.) Drawing all inferences in favor of Plaintiff, I find that she has alleged that her adverse treatment was because of her gender. As for discriminatory claims that are "gender-neutral," a plaintiff may "show that the sex-based verbal abuse indicate[s] that other adverse treatment was also suffered on account of sex." Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001). Therefore, even those allegations of discriminatory treatment that do not explicitly invoke Regan's gender should not be dismissed. It is frivolous to suggest otherwise.

For these reasons, Defendants' motion to dismiss Regan's discrimination claim is DENIED.

**2. Hostile Work Environment**

A hostile work environment for Title VII purposes arises when the workplace becomes "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65–67 (1986) (internal quotations and citations omitted). This test considers the totality of the circumstances, id. at 23, and "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Harris, 510 U.S. at 21 (1993)). "Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." Alfano, 294 F.3d at 374 (citations omitted).

Regan has pleaded a severe and pervasive pattern of hostility. Regan states that the Benchmark workplace was overwhelmingly sexist and male traders frequently made "negative, sexually graphic and objectifying comments about women." (Compl. ¶ 43.) She alleges that Benchmark employees constantly had graphic discussions of sexual acts and female body parts, and commonly referred to women as "bitches" and "hos." (Id. ¶¶ 53-55.) They also regularly viewed pornographic photographs and videos on Benchmark computers and emailed links to this content to clients and Benchmark co-workers, including Regan and members of Benchmark's management. (Id. ¶¶ 50-52.) Regan's complaint states that this sexualized environment interfered

with her ability to perform efficiently at work. (Id. ¶ 75.) For example, she felt uncomfortable making work-related telephone calls from her desk due to the loud profanity and sounds from pornographic videos in the background. (Id. ¶ 76.) When Regan complained about these conditions to Gordon, Messina, and other Benchmark managers, they took no remedial action and told Regan to get used to it. (Id. ¶¶ 77-79.) Regan states that this sexist and hostile work environment existed "from virtually the inception of her employment" at Benchmark. (Id. ¶ 43.) Given these and other alleged incidents, Regan has demonstrated that Benchmark's hostile work environment was severe and pervasive. See, e.g., Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 70, 75-76 (2d Cir. 2001) (finding a severe and pervasive hostile work environment where co-worker touched plaintiff in unwelcome manner on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life); but see Alfano, 294 F.3d 365 (finding no hostile work environment where plaintiff alleged only five incidents of harassment, over a span of more than four years, and some of the incidents lacked sexual overtone).

Regan has also adequately pleaded that this hostile environment occurred *because of* her sex. Although some of Regan's allegations are gender-neutral, others, as discussed with respect to disparate treatment, were explicitly due to Regan's gender. Specifically, Regan alleges that male co-workers regularly commented on her appearance and body parts, referred to her as a "bitch" or a "ho," and made her the subject of the game "wouldja, wouldja." (Id. ¶¶ 54, 68-71.) Given the specific instances of overtly sex-based discrimination, Regan has sufficiently pled that the hostile work environment existed because of her sex.

These incidents, taken together with the entirety of Regan's allegations, show a severe and pervasive pattern of hostility based on Regan's gender. Accordingly, Regan has satisfied the standard for pleading a hostile work environment claim under Title VII.

**3. Retaliation**

To prevail on a Title VII retaliation claim, Plaintiff must show: (1) participation in a protected activity known to Defendants; (2) an employment action disadvantaging Plaintiff; and (3) a causal connection between the protected activity and the employment action. Williams v. Time Warner Inc., 09 Civ. 2962, 2010 WL 846970, at *4 (S.D.N.Y. Mar. 3, 2010) (citing Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004). It is not necessary that Plaintiff plead a prima facie claim of retaliation in order to survive a motion to dismiss. Id. (citing Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 71-72 (2d Cir. 2006) (holding that Swierkiewicz applies to retaliation claims)). However, Plaintiff must plead facts sufficient to render her retaliation claims facially plausible under Twombly and Iqbal. Id. Plaintiff has met this burden.

a. *Adverse Employment Action*

An adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Benardo, 2011 WL 2565489, at *3 (citing Burlington, 524 U.S. at 761). Defendants argue that Regan's transfer to an inferior workspace on the trading floor followed by her transfer to Benchmark's Jersey City office do not constitute actionable adverse employment actions, because they did not result in "a significant change in employment status." (Defs. Mot. at 17 (citing Benardo, 2011 WL 2565489, at *3).) Accepting Regan's allegations as true for the purposes of this motion, Defendants' position is beyond ridiculous.

In moving Regan to the Jersey City office, Benchmark sent her to a remote location that was not really an office of the company, where she was estranged from co-workers and clients alike. (Compl. ¶¶ 187, 193-95.) As Regan told Benchmark at the time of the transfer, because her career and client base were in New York City, a transfer to Jersey City would interfere with her ability to effectively serve her clients. (Id. ¶¶ 174-75.) As Regan predicted, after her transfer to Jersey City, she lost both clients and income as a result of her ongoing technical malfunctions and inability to get in touch with Benchmark management regarding business matters. (Id. ¶¶ 191-202.) In addition, Regan alleges that her transfer ultimately led to her constructive discharge from employment at Benchmark. (Id. ¶¶ 220-21; Levy Aff. Ex. 1.) Thus, Regan's complaint sufficiently alleges an adverse employment action "causing a significant change in benefits." Benardo, 2011 WL 2565489, at *3 (citing Burlington, 524 U.S. at 761).

b. *Causal Connection*

Defendants also argue that Regan has not pleaded a causal connection between her participation in a protected activity and the alleged adverse employment action. This argument relies on the erroneous contention that Regan's April 2007 EEOC complaint was the only protected activity in which she engaged. In fact, the numerous internal complaints that Regan made to Gordon, Messina, and other Benchmark managers also constitute protected activity. See Hubbard v. Total Commc'ns Inc., 347 Fed. App'x. 679, 681 (2d Cir. 2009) ("[An] informal complaint of discrimination is enough to satisfy the protected activity requirement under Title VII."). Regan's complaint documents many instances of discriminatory treatment by Defendants following her participation in protected activity, with such adverse treatment culminating in her transfer to the Jersey City office and her constructive discharge. When all of the relevant allegations are considered, Regan has demonstrated a causal connection between her protected

activity and the Defendants' adverse employment action. Accordingly, Regan has sufficiently pled a claim of retaliation.

D. Regan's NYCHRL Claims

In addition to her claims under Title VII, Regan alleges gender discrimination and retaliation pursuant to the NYCHRL. (Compl. ¶¶ 242-50.) As Defendants argued with respect to Regan's Title VII claims, they contend that Regan's NYCHRL claims fail because: (1) she has not shown that she was treated differently because of her gender; and (2) she has not alleged an actionable adverse employment action.

On a motion to dismiss, the same standard of review applies to both Title VII claims and NYCHRL claims. Ochei, 2011 WL 744738, at *3 (citations omitted). Therefore, for the same reasons that Regan's Title VII claims survive the motion to dismiss, the Court will not dismiss her NYCHRL claims pursuant to Rule 12(b)(6).

In addition, because the Court has not dismissed Regan's Title VII claims, it will not dismiss the NYCHRL claims for a lack of subject matter jurisdiction under Rule 12(b)(1).

Defendants' alternative arguments for dismissal of Regan's NYCHRL claims, discussed below, are without merit.

**1. Plaintiff Alleges Conduct with an Impact in New York City**

To state a claim under the NYCHRL, a plaintiff must allege discriminatory conduct occurring in New York City. Benardo, 2011 WL 2565489, at *6 (citations omitted). "To determine where the conduct occurred, courts look at the location of the impact of the offensive conduct." Id. (citing Pouncy v. Danka Office Imaging, 06 Civ. 4777, 2009 U.S. Dist. LEXIS 44752, at *41 (S.D.N.Y. May 19, 2009) (internal quotations omitted)).

Here, Defendants argue that Regan's NYCHRL claims do not allege discriminatory conduct with an impact in New York City, because Regan both lived and worked in New Jersey. (Defs. Mot. at 22.) Defendants note that Regan's retaliation claim "rests almost entirely on her transfer to Benchmark's Jersey City office." (Id.) However, Regan's claims under the NYCHRL include both discriminatory treatment and retaliation. Moreover, her retaliation claim encompasses employer conduct other than the transfer to the Jersey City office.

Even if the Jersey City transfer were Regan's sole claim under the NYCHRL, Defendants' argument that this action had no impact in New York City is disingenuous. First, the transfer was the culmination of a number of alleged discriminatory acts that took place at Benchmark's New York City office while Regan worked there. Second, even after Regan was transferred to Benchmark's Jersey City office, she remained affiliated with the New York City office to the extent possible. In particular, Regan continued to service New York City-based clientele and remained under the management and supervision of Benchmark's New York City office. (Compl. ¶¶ 190-203.) Therefore, although Regan was physically working out of Jersey City, all other aspects of her employment connected her to Benchmark's New York City office. As a result, the alleged discriminatory conduct both occurred in New York City and had an impact in New York City. See Pouncy, 2009 U.S. Dist. LEXIS 44752, at *42 (finding that discriminatory conduct had an impact in New York City where the majority of plaintiff's client accounts were located in New York City).

**2. Plaintiff Sufficiently Pleads Aiding and Abetting Claims**

"An individual may be held liable for aiding and abetting violations of NYCHRL . . . if he participates directly in discriminatory acts alleged by the Plaintiff." Cloke-Browne v. Bank of Tokyo-Mitsubishi UFJ, Ltd., 10 Civ. 2249, 2011 WL 666187, at *10 (S.D.N.Y. Feb. 9, 2011). A

finding of participation in the alleged discriminatory conduct "requires a showing of direct, purposeful participation." Fried v. LVI Servs., Inc., 10 Civ. 9308, 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011). Under this framework, Defendants argue that Regan has failed to plead facts sufficient to support her claims of aiding and abetting against Gordon and Messina. (Defs. Mot. at 22.)

To the contrary, Regan's complaint sets forth a number of instances in which Gordon and Messina played active roles in the discriminatory and hostile work environment at Benchmark. Specifically, Regan alleges that Gordon and Messina took part in the daily sexualized banter and behavior at Benchmark, such as spying on women in nearby college dormitories, discussing women in graphic and sexual terms, and playing the sexual fantasy game "wouldja, wouldja." (Compl. ¶¶ 47-48, 57-58.) In addition, Gordon regularly organized after-hours trips to strip clubs for himself and other Benchmark employees, including one such trip when he required Regan to attend against her wishes. (Id. ¶¶ 59, 63-66.) On a number of occasions, Gordon expected Regan to flirt with clients and prospective clients, even though male Benchmark employees were not required to do so. (Id. ¶¶ 74, 91-99.) Following these and other incidents, Gordon and Messina refused to take remedial action when Regan complained about discriminatory treatment. (Id. ¶¶ 77-79, 83-84, 88-90, 97-99.) Furthermore, Gordon and Messina made the management decisions that sent Regan to New Jersey and ultimately led to her alleged constructive discharge. (Id. ¶¶ 169-210, 221.) In particular, they removed Regan from client accounts, allowed male traders to solicit business from her accounts, and transferred her to inferior workspace, eventually resulting in her transfer to the isolated Jersey City office. (Id. ¶¶ 25, 28, 39, 41-42, 104-15, 151-54, 169-210.) These allegations are sufficient to state a claim of aiding and abetting under the NYCHRL. Accordingly, Defendants' motion to dismiss these claims is DENIED.

### 3. Plaintiff's NYCHRL Claims Are Not Time-Barred

The NYCHRL has a three-year statute of limitations. New York City Admin. Code § 8-502(d). The statute of limitations is tolled during the period in which a complaint is filed with the EEOC. Siddiqi v. N.Y. City Health & Hosps. Corp., 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008) (citing Martinez-Tolentino v. Buffalo State College, 715 N.Y.S.2d 554, 555 (N.Y. App. Div. 2000)). Because Regan filed her first complaint with the EEOC on April 28, 2007, events alleged to have occurred on or after April 28, 2004 are timely.

NYCHRL claims based on conduct that occurred before April 28, 2004, are time-barred unless they fall under the continuing-violation doctrine. The standard for applying the continuing-violation doctrine to claims under the NYCHRL is the same as that applied to Title VII claims. Bermudez v. City of New York, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011). Therefore, as discussed above, otherwise time-barred allegations fall under the continuing-violation doctrine and are not time-barred.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's complaint is DENIED. Accordingly, it is unnecessary for this Court to decide Plaintiff's motion for leave to replead.

The clerk of court is directed to remove the motion to ECF No. 11 from the Court's list of open motions.

Dated: March 1, 2012

U.S.D.J.

BY ECF TO ALL PARTIES